Nathaniel THOMAS *v.* STATE of Arkansas

CR 93-520                                            868 S.W.2d 483

Supreme Court of Arkansas
Opinion delivered January 18, 1994

*Lea Ellen Fowler O'Kelley*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Kent G. Holt*, Asst. Att'y Gen., for appellee.

JACK HOLT, JR., Chief Justice. This is an appeal from the criminal convictions of Nathaniel Thomas for capital murder and first-degree murder. Appellant Thomas was charged by felony information on April 7, 1992, with three counts of capital murder for his role in the shooting deaths of Cyrus Lee, Sabrina Earl, and Marcus Johnson at an apartment in Little Rock on February 19, 1992.

He was tried before a jury on December 9 and 10, 1992, in Pulaski County Circuit Court and was found guilty of the capital murder of Cyrus Lee, and the first-degree murders of Sabrina Earl, a pregnant woman, and Marcus Johnson. Thomas received a sentence of life imprisonment without parole for the capital murder and two forty-year sentences for the first-degree murders. The trial court ordered the two forty-year terms to run concurrently together but consecutive to the life term.

On appeal, Thomas raises two points for reversal, one regarding the sufficiency of the evidence and the second concerning the admissibility of custodial statements. Neither argument has merit, and we affirm the judgment of the trial court.

*I. Sufficiency of the evidence*

In his first argument, Thomas contends that the evidence presented at trial was insufficient to establish that he had committed the crimes with which he was charged. Indeed, the proof at trial consisted primarily of Thomas's own taped statements, given to police after his apprehension. It is Thomas's contention that nothing he said to the officers could be considered sufficient evidence that he had acted with the purpose of furthering a homicide.

However, Thomas's sufficiency argument was not preserved for appeal. He made a motion for a directed verdict at the close of the State's case and then called his own witnesses. A defendant who goes forward with the production of additional evidence after a directed verdict motion is overruled waives any further reliance upon the former motion. *Crawford* v. *State*, 309 Ark. 54, 827 S.W.2d 134 (1992); *Rudd* v. *State*, 308 Ark. 401, 825 S.W.2d 565 (1992).

At the conclusion of the case for the defense, Thomas's attorney introduced a stipulation concerning expert testimony about blood on a jacket and tee-shirt. The State called a rebuttal witness, and, after her appearance, Thomas's attorney moved for a mistrial on the basis that the State had violated the rule of sequestration of witnesses. The court agreed to consider the motion if it could be shown that the prosecutor had access to information regarding the rebuttal testimony in the police case file.

The State rested its rebuttal, and both the prosecutor and the defense counsel indicated that they were ready for the court to instruct the jury. Following the delivery of instructions, closing arguments were made. The jury then retired to consider its verdict.

At that point, defense counsel developed the objection made earlier in relation to the testimony of the State's rebuttal witness. A police report was read into the record by Thomas's attorney as a proffer of the reporting officer's testimony in an effort to point to other potential suspects.

Only then did the subject of the renewal of the motion for directed verdict arise. The following exchange occurred between the trial judge and the defense counsel:

THE COURT: I think you also wanted to put on the

record that you had renewed your motion for directed verdict.

MS. O'KELLEY: Correct, and renew all of our previous motions.

Discussion then immediately returned to the proffered testimony of the police officer. The reference to a motion for directed verdict was rather parenthetical in nature, suggesting an afterthought on the part of court and counsel.

Nothing in the record suggests that an unrecorded renewed motion had been lodged earlier. Instead, it appears that the prompting of the trial court was required to nudge Thomas's attorney to make a belated renewal of the motion for a directed verdict made at the close of the State's case-in-chief. But by that time, the jury was well into the course of its deliberations, and it was too late for renewal.

This court has repeatedly and emphatically held that, in order to preserve for appeal the issue of the sufficiency of the evidence in a criminal case, the appellant must move for a directed verdict both at the close of the State's case and at the close of the whole case. *Hayes* v. *State*, 312 Ark. 349, 849 S.W.2d 501 (1993); *Collins* v. *State*, 308 Ark. 536, 826 S.W.2d 231 (1992); *DeWitt* v. *State*, 306 Ark. 559, 815 S.W.2d 942 (1991).

In *Henry* v. *State*, 309 Ark. 1, 828 S.W.2d 346 (1992), the appellant had moved for a directed verdict at the close of the State's case but failed to renew the motion at the end of all the evidence as required by Ark. R. Crim. P. 36.21(b) — the same as in this case. We held that the rule is strictly construed and that, accordingly, Henry's argument concerning the sufficiency of the evidence could not be considered. *See also Miller* v. *State*, 309 Ark. 117, 827 S.W.2d 149 (1992).

This case presents a different, somewhat novel, twist. With a suggestion from the trial court, the defense attorney signaled her desire to renew her motion for a directed verdict. Yet the whole case had long since closed, and the jury had long since retired. Thomas contends that such a practice is common in the Second Division of Pulaski County Circuit Court and amounts to "procedural housekeeping." But a motion for a directed verdict at the

close of the case is something more than a matter of mere form: it goes to the substance of the evidence arrayed against the criminal defendant. It is not a technicality subject to "tidying up" in chambers.

This court has had occasion, in *Hayes* v. *State, supra,* to address another curious set of circumstances. There, Hayes failed altogether to move for a directed verdict but did move, at the conclusion of a discussion of instructions prior to the jury's return to the courtroom, for a dismissal for lack of evidence. "Even if we were to equate the dismissal motion with one for a directed verdict," we declared, "we would not consider it because of failure to make the motion at the conclusion of the prosecutor's case. . . . We observe . . . that the Rule is stated in the conjunctive, clearly requiring the motion to be made in both instances. . . ." 312 Ark. at 352.

The issue of the sufficiency of the evidence has not been properly preserved, and we will not address it.

## II. Custodial statements

For his second point for reversal, Thomas argues that the trial court erred in admitting statements he had made to police officers while in custody.[1] He asserts that the statements, which formed the backbone of the State's case against him, were obtained by means of false promises made by the police and were therefore involuntary under the totality of the circumstances.

---

[1]It should be noted that the transcripts of the three taped statements of March 8, 9, and 12, 1992, were not admitted into evidence (the trial court having sustained defense objections). The tapes were played in open court, however, and the proffered transcripts appear in the record at T. 906, T. 909, and T. 913. Both the appellant and the State have abstracted the March 8 statement, in which Thomas placed himself in the parking lot of the apartment complex where the murders occurred at the time they occurred and described the crime scene and the actions of three other men charged in the killings. (The other two statements involved photographic identification and clarification of the earlier narrative.) The State contends that Thomas has failed to provide a complete record from which this court can determine the asserted error. However, not only was the crucial March 8 statement abstracted by both Thomas and the State, but the testimony of Detective Joe Oberle, who conducted the taped interviews, is available in the record and has been abstracted. The tapes have also been appended to the record. Thus, this court has before it an adequate record for consideration of the issue raised on appeal.

Custodial statements are presumed to be involuntary. *Moore* v. *State*, 303 Ark. 1, 791 S.W.2d 698 (1990). On appeal, the burden is on the State to show that the confession was made voluntarily, freely, and understandingly, without hope of reward or fear of punishment. *Sanders* v. *State*, 305 Ark. 112, 805 S.W.2d 953 (1991). A statement induced by fear or hope of reward is not voluntary. *Davis* v. *State*, 275 Ark. 264, 630 S.W.2d 1 (1982). In determining whether a custodial statement is voluntary, this court makes an independent review of the totality of the circumstances and reverses only if the trial court's findings are clearly against the preponderance of the evidence. *Sanders* v. *State, supra.* The totality is subdivided into two main components: the statement of the officer and the vulnerability of the defendant. *Id.*

Thomas testified at the suppression hearing that he had been in and out of the criminal justice system for more than twenty years and had more than four prior felony convictions. He stated that he had been given immunity for his testimony in a 1977 capital murder trial.

Thomas was pulled over while driving on March 8, 1992, and subsequently arrested on the basis of outstanding warrants on unrelated charges and given his *Miranda* rights by Little Rock police officer Randy Reaves. The arresting officer, who had known Thomas in connection with other police matters for a period of time, transported him to the police station and inquired if he knew anything about the triple homicide.

Thomas testified that he had been smoking crack cocaine in a glass pipe at the time of his arrest and that, when he and the officer reached the parking lot of the police station, Officer Reaves dropped the crack pipe on the ground and stepped on it, saying that "We ain't got to worry about that crack pipe. Let's go on in here, see what we can't work out after we talk to this detective." According to Thomas, after Detective Joe Oberle joined them in an interrogation room, Officer Reaves reminded him, after he had spoken vaguely about the killings, that "You have these warrants from Pulaski County, and we have this theft charge, and we are thinking about charging you with this crack. . . . You can do better."

Thomas stated that the police offered the names of the three men who were eventually charged along with him, advising him that the law enforcement authorities would help him with his charges if he would tell them what he knew. Thomas claimed that Detective Oberle said that he would have to implicate himself in the murders in order to get the three other men and that the detective could arrange the same sort of immunity deal that Thomas had received in the 1977 murder case. Thomas testified, further, that Detective Oberle "went so far as to tell me that I could say I drove the car" and fed him details of the crime, such as the volume of the music in the apartment at the time of the murders and the specially altered bullets used in the slayings.

Thomas declared that he began telling lies "as a way of getting out of the trouble I was in right then, and so I just took the ball and went running with it." He acknowledged having made the taped statements but said, "There's some of the things that I read like my own transcript. There's some of the things I lied so bad in them that I don't remember saying them. . . . You know, at that point in time, it didn't matter, you know, as long as I could get out, and they were promising me that I could get out if I went along with this story."

In addition, Thomas testified that he had been under the influence of "narcotics" when he made his statements and that he would not otherwise have "had enough nerve to sit in there and involve three honest people, let alone myself, in a triple homicide that I didn't have, you know, knowledge of whatsoever."

Officer Reaves testified that he had known Thomas on the street and that Thomas was knowledgable in street activity. After the arrest and Mirandizing, Officer Reaves said, Thomas mentioned three people who were involved in the murders in question and stated that he had been at their house that night, remaining there when they left and after their return.

According to Officer Reaves, Thomas appeared to be "rational and okay" when he spoke with him. He did not appear to be under the influence of intoxicants and was "polite and cooperative." Thomas's statements, contained in the record, are in fact notable for their alert responsiveness, coherent narrative order, and articulate cogency.

Officer Reaves denied confiscating a crack pipe or telling Thomas that he would not be charged with a drug offense if he cooperated in the murder investigation. He also testified that no threats or promises were made to Thomas from the time of his arrest until the March 8, 1992 statement was recorded.

Detective Joe Oberle stated, as well, that no threats or promises were made to induce Thomas to give any of his three statements. He, too, said that Thomas did not appear to be impaired by drugs or alcohol during that period.

Several friends of the appellant offered testimony about Thomas's drug use in general and his vulnerability during the period in question. One witness, who had been incarcerated with Thomas at the time, stated that Thomas was exhausted when he was brought to the cell and that he went to sleep. Both that witness and another person who was also incarcerated with the appellant stated that they saw Thomas smoking cocaine in jail.

Another witness, whose car Thomas had been driving at the time of his arrest, testified that he was called to pick up his car at the site of the arrest. He stated that he saw Thomas in custody and that he saw a police officer with a glass pipe used for smoking cocaine in his hand.

Reviewing the evidence, it is clear that the witnesses were widely divergent in their testimony regarding the circumstances under which Thomas made his statements to the police. When testimony concerning the circumstances surrounding the taking of a confession is conflicting, it is for the trial court to weigh the evidence and resolve the credibility of the witnesses. *Orr* v. *State*, 288 Ark. 118, 703 S.W.2d 438 (1986). This court will not disturb the trial court's finding unless it is clearly against the preponderance of the evidence. *Id.*

It is abundantly clear from an examination of the record that Thomas was intimately familiar with the workings of the criminal justice system and had once before been called as an immunized witness for the prosecution, thereby escaping a criminal charge. We hold that the trial court's finding that the taped statements should be admitted was not clearly against the preponderance of the evidence.

### III. Rule 4-3(h)

The record in this case has been reviewed for prejudicial error pursuant to Ark. Sup. Ct. R. 4-3(h), and none has been found.

Affirmed.